# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:07-CR-92-TS |
| | ) | |
| JOVAN MICHAEL BROOKSHIRE | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant Jovan Michael Brookshire's Motion to Suppress [DE 18], filed on May 28, 2008. In his post-hearing brief, the Defendant concedes that it was proper for law enforcement to enter his home to effectuate an arrest warrant for a probation violation, but contends that they were not justified in conducting a protective sweep as contemplated by the Supreme Court in *Marlyand v. Buie*, 494 U.S. 325 (1990). He also argues that the consent he gave to police later during the same incident to search the residence was tainted by the illegal protective sweep, and that the Court should suppress all items seized after his immediate arrest as well as any statements he made after his arrest.

## BACKGROUND

An Indictment filed by the Government on October 10, 2007, charges that the Defendant possessed with intent to distribute fifty grams or more of cocaine crack (Count 1), possessed a firearm in furtherance of the drug trafficking crime charged in Count 1 (Count 2), and possessed a firearm after being convicted of a felony (Count 3). On May 28, 2008, the Defendant moved "to suppress any and all evidence seized as a result of the detention of the Defendant and the subsequent seizure and search of the home which led to the seizure of contraband material as well as statements by the Defendant." (Motion to Suppress 1, DE 18.) On June 12, the

Government responded to the Motion. On July 16, the Court conducted an evidentiary hearing to address the matters raised by the Defendant's Motion and the Government's Response. The Defendant was present in Court with his counsel, Robert Gevers, and the Government was represented by Assistant United States Attorney Tina Nommay. The Government and the Defendant examined the following members of the various law enforcement agencies that were involved in the Defendant's October 19, 2007, arrest or the search of his residence: Deputy United States Marshal John Simpson; Allen County Sheriff Deputy Brock Williams; Deputy United States Marshal Michael Evett; and ATF Task Force Officer Miguel Rivera. Numerous exhibits were also admitted into evidence for the Court's consideration. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs.

On September 22, 2008, the Defendant submitted a post-hearing Memorandum in Support of Defendant's Motion to Suppress [DE 28]. On November 5, the Government filed its Post Hearing Brief in Opposition to Defendant's Motion to Suppress [DE 32]. On December 8, the Defendant submitted his final brief [DE 35]. The Defendant maintains throughout his briefing that law enforcement officials' sweep of the house violated his Fourth Amendment rights because they did not articulate reasonable suspicion that any other individuals posing a danger to police were hiding inside the home. The Government contends that the search of adjoining rooms, most importantly the kitchen where evidence of drug trafficking was observed in plain view, was justified as a limited protective sweep to ensure the officers' safety. Regarding his consent for officers to search the home, the Defendant argues that it was not voluntary because a person in his position would know that controlled substances were already

found, but would not know that the initial search was unlawful. He also notes that he was not *Mirandized* before talking to Detective Rivera and consenting to the search. The Government submits that the totality of the circumstances shows that the Defendant's consent was freely and voluntarily given.

## FINDINGS OF FACT

Upon consideration of the credibility of the witnesses, the Court makes the following findings of fact.

On September 26, 2007, an arrest warrant was issued for the Defendant for violating the conditions of probation that he was serving in a criminal cocaine possession matter. He was not immediately arrested on the warrant because law enforcement officials did not know where to find the Defendant, and his family had not been cooperative in law enforcement's efforts to locate the Defendant. According to the pretrial services report that was prepared in the federal case for which the Defendant was on supervised release, his previous criminal history included felony battery for being involved in a 1998 incident in which he was one of four individuals inside a vehicle that opened gunfire on another vehicle while at an intersection, continued to shoot at the vehicle during a car chase, and eventually broke the windshield and wounded an occupant.[1]

On October 19, the U.S. Marshals obtained information that the Defendant would be

---

[1] During the evidentiary hearing, the Government requested that the Court to take judicial notice of the pretrial services report that was prepared on October 22, 2007, for Cause Number 1:01-CR-20-WCL. The Defendant did not object and the Court stated that it would take judicial notice of the report. *See* Fed. R. Evid. 201. Accordingly, without commenting on the accuracy of the information in the report, the Court finds that the Defendant's criminal history was reported to include the incident outlined above.

located at a particular residence in Fort Wayne. Deputy Simpson received a call to go to this residence to conduct surveillance until other deputies could join him to make the arrest. Deputy Simpson arrived at the house around 9:30 or 9:45 AM and stayed outside in view of the front of the house. He did not see any activity at the house from this vantage point.

Around 10 AM, Deputy Evett and Deputy Tim Fraley arrived at the house along with two deputies from the Sheriff's Department Warrants Division. None of the officers knew the layout of the home that they were going to enter. Deputy Fraley, Deputy Simpson, and Sheriff Deputy Brock Williams approached the front door while Deputy Evett and Sheriff Deputy Robert Headford went to the back of the house. Deputy Fraley knocked loudly on the front door and announced the officers' presence. As he did so, the door swung open and he noticed a man, whom he recognized as the Defendant from pictures, sleeping on a couch in the living room. The deputies entered the house with their guns drawn. As the Defendant awakened he sat up on the edge of the couch and was immediately handcuffed.

A coffee table, containing several items, was located in front of the couch. Some of the items the deputies noticed on the table were a green, leafy substance, blunts in an ashtray, rolling paper, and a pair of scissors.

Once the Defendant was secured, the deputies inside the house radioed to the deputies in the back to come into the house through the front. At the same time, the Defendant, who was wearing a t-shirt and boxers, asked if he had to go to jail in his under clothes. Deputy Simpson offered to retrieve a pair of pants for the Defendant. The Defendant directed Deputy Simpson to his bedroom, which was directly across from the living room through a short hallway, and told him there was a pair of sweat pants on the bed. Simpson went to the bedroom as another officer

4

covered him in the hallway. This same hallway also led to a bathroom, a second bedroom, and the kitchen. (*See* Diagram, Suppr. Hr'g Exs. 23, 23A) (attached to this Opinion and Order).

When Deputy Simpson got to the bedroom, he holstered his gun and picked up a pair of pants from the bed. Underneath the pants he saw an open gun case with two magazines and loose rounds of ammunition laying inside. However, there was no gun in the case. Simpson announced his finding to the other deputies. When he returned to the living room with the pants, he saw that Sheriff Deputy Brock had found a loaded firearm on the floor, just under the couch where the Defendant had been sleeping. The gun was loaded with a bullet in the chamber.[2]

After discovering the gun case, the officers decided to do a protective sweep of the entire house "[f]or officer safety, um, to make sure there was not other individuals inside the residence, they could ambush us, and pretty much, officer safety." (Suppr. Hr'g Tr. 17, Deputy Simpson.) The officers swept the other rooms of the house, which included a second bedroom, a bathroom, and the kitchen on the first floor. They also scanned areas where a person could be hiding in the basement and the upstairs attic area. During the sweep of the kitchen, the officers observed a digital scale that had a razor blade and a white powdery substance on it and a plastic baggie containing a white substance believed to be powder cocaine on the kitchen counter. In the upstairs area they saw $100 bills, clothes, empty baggies, hydroponic marijuana growing books, and rows of shoes. The sweep lasted, at most, ten minutes, and the officers did not move or remove any items.

Because the U.S. Marshals do not conduct investigations for firearms or drugs, and because they discovered a loaded firearm and knew that the Defendant was a felon, they

---

[2] The record does not indicate whether the deputies believed that the gun discovered under the couch was the gun that was missing from the gun case.

contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Ten to twenty minutes later, Task Force Officer Miguel Rivera and Special Agent Sean Skender responded to the scene. During this time, the arresting deputies waited in the living room with the Defendant.

The deputies told Officer Rivera about the firearm and ammunition, and about the drug paraphernalia they observed in plain vew in the kitchen. The Defendant recognized Officer Rivera from some previous contacts with him and initiated conversation. The two talked cordially. The Defendant admitted that the residence was his and said that he would give his consent to search the house. Officer Rivera retrieved a consent to search property form from his car. Once Officer Rivera had the form, he asked that the Defendant be taken out of his handcuffs so he could read the form. Upon reading the form and having it read to him, the Defendant initialed that he both read, and had read to him, the statement of his rights and that he understood his rights, and he signed the waiver of rights portion of the form. Special Agent Skender was also talking to the Defendant and signed the form as a witness along with Rivera and one of the deputies. None of the officers had weapons drawn. Officer Rivera testified that the Defendant showed no hesitancy in providing consent and was very cordial throughout the exchange. If the Defendant had not consented to the search, Officer Rivera would have sought a search warrant on the basis of the items already observed inside the house.

After the Defendant signed the consent form, Deputy Williams took him out to his squad car and put him in the front seat with Deputy Headford. Officer Rivera and Agent Skender searched the house and documented evidence. After discovering further evidence of drug trafficking, Agent Skender came to the car and read the Defendant his *Miranda* rights.

## CONCLUSIONS OF LAW

**A.    Protective Sweep**

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Bleavins v. Bartels*, 422 F.3d 445, 450 (7th Cir. 2005). One exception to the prohibition on a warrantless search of a person's home is a search of the area immediately surrounding an arrestee incident to his arrest, an exception first recognized in *Chimel v. California*, 395 U.S. 752 (1969). The Defendant does not dispute that the deputies' actions in locating the firearm under the couch that the Defendant was laying on when he was arrested were appropriate and reasonable. The Defendant maintains, however, that once the arresting officers entered the home, placed him under arrest, secured him in handcuffs, and searched the area within his immediate control, the investigation was complete and "there was no need for law enforcement officers to conduct a protective sweep of the home." (Def. Mem. 8, DE 28.) The Defendant argues that, even though the officers had discovered a gun, there was no articulable basis to suspect that the officers' safety was a concern because the Defendant had already been arrested and secured and there was no reason to believe that any other individuals were inside the home.

Based on the Defendant's arguments, and upon the presentation of the facts, the warrantless search exception at issue in this case is the "protective sweep," first described in *Maryland v. Buie*, 494 U.S. 325, 331 (1990). *Buie* identified two different protective sweep circumstances. The first scenario allows officers to "look in closets and other spaces immediately

7

adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. This may be done as a "precautionary matter and without probable cause or reasonable suspicion." *Id.* Second, where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene," the search may extend beyond the parameters of the first type of protective sweep. *Id.*; *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 627 (7th Cir. 2008). Officers have an interest in ensuring their safety when they lawfully enter a house, which justifies allowing them to ensure "that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005) (citing *United States v. Burrows*, 48 F.3d 1011, 1015–16 (7th Cir. 1995)) (explaining policy concerns behind protective sweep exception to warrant requirement). Whether a protective sweep is reasonable is a fact specific inquiry. *Leaf*, 400 F.3d at 1087; *Burrows*, 48 F.3d at 1016 (stating that the inquiry is very fact specific and requires that the circumstances of a particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and other cases recognizes exceptions to the warrant requirement when officer safety is at risk). In any event, the protective sweep is "not a full search of the premises" and "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

      The Government contends that the only room at issue is the kitchen because it is where Deputy Evett saw, in plain view, evidence of cocaine dealing. The Government notes that this was adjoined to the room just behind the couch on which the Defendant was found sleeping. Therefore, the Government argues, the sweep was of the type dictated by the layout of the

8

premises, and the deputies did not need probable cause or reasonable suspicion to look in the kitchen as a precautionary measure. The Government further argues that the search was quick and was limited to determining whether anyone was in the room who could cause them harm.[3]

In response to the Government's argument about a precautionary sweep, the Defendant does not address the first type of protective sweep. Rather, concentrating on the expanded *Buie* search criteria, he states that a protective sweep must be supported by specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene, and that the officers had no reasonable belief that others were present in the home. He notes that they heard no noises, the Defendant gave no indication that others were present, and they had not seen anyone enter or exit the home despite having conducted surveillance. Thus, the Defendant argues, without specific and articulable facts that others were inside the house, the discovery of a gun was without import as it related to officer safety.

The Court agrees that the officers had no objective basis to believe that anyone else was inside the house.[4] However, the in-home arrest of the Defendant put the arresting officers at the

---

[3] The Government addressed the search of the remainder of the house briefly, arguing that it was justified as a non-intrusive protective sweep given the small size of the home, the discovery of the gun and two magazines, the deputies knowledge that the Defendant had a girlfriend, and the discovery of controlled substances and digital scale in plain view, which provided further concern regarding the activities going on in the house and whether others could be involved. The Government argues that even if the Defendant contends that there was no justification for the broader search of the upstairs and the basement, "it is of no consequence because there was no contraband seen in these areas during the limited sweep" and that money was only discovered in these areas after the consent to search had been obtained. (Gov't Post Hrg. Br. 14 n.20, DE 32.) At one point, before asserting that the sweep of the kitchen did not require any level of suspicion, the Government argues that the Defendant conceded in his brief that once the gun was found, the deputies conducted a protective sweep out of concern for their safety. (Gov't Post Hrg. Br. 13.) The Court does not read the Defendant's brief as making any concession. Rather, he argues that the only explanation the deputies provided for the search was a concern for their safety, but that the circumstances did not support any such concern due to the lack of objective evidence that any other persons were actually inside the home.

[4] The officers had no prior experience with persons at this house, did not know of any criminal associates of the Defendant, did not see other people at the house, did not hear noises inside the home, entered the front door immediately upon knocking when the door just swung open, and had other officers located at the back of the house during the entry. Although the discovery of an empty gun case most likely caused some concern, it was not coupled with any reason to believe that another person was in the house. In fact, the Defendant's pants were on top of the

disadvantage of being on their "adversary's 'turf,'" as it occurred in a "confined setting of unknown configuration." *Buie*, 494 U.S. at 333. The "adversay" in this matter was a felon who was in violation of his supervised release and had a loaded firearm in close proximity to him when he was apprehended. The dangerous nature of arresting the Defendant inside his home meant that the arresting officers, "as a precautionary matter and without probable cause or reasonable suspicion" could "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. A sketch of the layout of the house, as well as the arresting officers' testimonies, show that the Defendant was arrested in the living room of a small two-bedroom home, with each bedroom and the kitchen adjoined to the living room by a short hallway. The living room was at most, twelve feet by twelve feet, and may have been ten feet by ten feet. A person could reach any of the rooms on the first floor from another of the rooms with only a few quick strides through the hallway. The Government states that the kitchen was a "room just behind the couch on which [the Defendant] layed [sic] at the time of his arrest." (Gov't Post Hr'g Br. 14.) Although the kitchen was "behind" the couch, there was a wall between the kitchen and the living room. The Court finds it more accurate to say that the kitchen was off of a short hallway that connected all of the rooms, including the living room, making it, literally, just around the corner from the arresting officers. Even so, the kitchen was close enough to the living room that an attack could be "immediately launched," *Buie* 494 U.S. at 334, from there. A photograph of the couch shows that the end of the couch abutted the living

---

case, and reasonably had been for some length of time given that he was sleeping on the couch immediately preceding the deputies' entry into the home. The Court recognizes the possibility that someone else was in the home existed, as is the case in the majority of in-home arrests. But there were no articulable facts to indicate such, and protective sweeps that extend beyond spaces that immediately adjoin the place of arrest are not "automatic," and "may be conducted only when justified by reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 336.

room wall that is common with the hallway, and that the couch was wide enough to extend out to the hallway opening, leaving no space in the living room between the couch and the hallway opening. (Photograph of Couch, Suppr. Hr'g Ex. 2) (attached to this Opinion and Order).[5] Moreover, the Defendant expanded the area of his arrest from the living room to the hallway that connected all of the rooms when he asked a deputy to go to his bedroom to retrieve pants for him to wear to jail. The kitchen was adjacent to the hallway through which the deputy had to walk and another deputy had to cover him. The kitchen was thus a space that was close enough to the deputies who were in the hallway that an attack could be immediately launched from it.[6]

Because the Defendant focuses on the second type of *Buie* sweep, he does not specifically address the area that he considers the place of his arrest or dispute that the kitchen was immediately adjoining the hallway in which he asked a deputy to go to get his pants. The D.C. Circuit rejected a defendant's narrow construction of his place of arrest and corresponding adjoining spaces and held that "[i]f an apartment is small enough that all of it immediately adjoins the place of arrest and all of it constitutes a space or spaces from which an attack could be immediately launched, . . . then the entire apartment is subject to a limited sweep of places where a person may be found." *United States v. Thomas*, 429 F.3d 282, 287–88 (D.C. Cir. 2005) (brackets, quotations marks, and citations omitted) (upholding search of bedroom that was a straight shot down the hallway even though it was fifteen feet away from the area of apprehension); *see also United States v. Lauter*, 57 F.3d 212 (2d Cir. 1995) (upholding

---

[5] The sketch of the living room, which is not to scale, puts the couch some distance from the wall and from the doorway that opens to the hallway. The photograph reveals that the couch is against the wall and mere inches from the doorway to the hall.

[6] The discovery of the gun case did not make this possibility any more or less probable, and it is not the basis on which the reasonableness of the sweep turns.

precautionary sweep of second room of a two-room apartment, which was immediately adjacent to room where the defendant was arrested); *United States v. Ford*, 56 F.3d 265, 270 (D.C. Cir. 1995) (finding that a bedroom immediately adjoining a hallway in which the defendant was arrested was within the scope of a precautionary *Buie* sweep). Although the Seventh Circuit has not directly addressed the meaning of "immediately adjoining" in the context of the confined quarters of a small house or apartment, in *dicta* it characterized *Buie* as allowing police to "walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within," and that the "officers need not demonstrate any danger; they may simply look as a precaution." *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) (using the *Buie* scenario as an example of the kind of intrusion that is justified by a lower degree of suspicion).[7]

Making a cursory visual inspection of the kitchen immediately following the Defendant's arrest and while the officer awaited the arrival of ATF to assure that no one was present who could cause the arresting officers danger was reasonable under the *Buie* exception. The Defendant takes issue with the deputies' decision to remain in the home while they waited for ATF agents to arrive, arguing that they could have left the home after arresting the Defendant and without conducting any protective sweep. However, the fact remains that the sweep was conducted immediately after Deputy Simpson passed through the hallway, went to the bedroom to retrieve pants, discovered the gun case, and passed through the hallway again, not at some time later while waiting for ATF to arrive. Thus, even if the arresting officers could have left at this time, they would have been entitled to sweep the areas adjoining the hallway as they waited for the Defendant to put his pants on and made their departure from the home, as the arrest

---

[7] Although the Seventh Circuit has never used this language from *Brown* to uphold protective sweeps of adjoining rooms, neither has it indicated that this characterization is not accurate.

12

would not have been complete until they were safely outside the house. *See, e.g., United States v. Robinson*, 775 F. Supp. 231, 234–35 (N.D. Ill. 1991) (holding that even though sweep may last no longer than it takes to complete the arrest and depart the premises, officers are not required to surreptitiously back out of a building, guns drawn, pointing in all directions, and that arrest is not complete if officers are gunned down by person concealed in spaced immediately adjoining the place of arrest); *see also Burrows*, 48 F.3d at 1017 n.9 (noting that an "unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of officers and others as does the assailant who attacks the officers upon entry"). Moreover, the arresting officers limited the scope of the search to achieve the legitimate end recognized in *Buie*. In finding the sweep of the kitchen reasonable, the Court has balanced the Defendant's interests in the protection of the Fourth Amendment against the legitimate governmental interest of ensuring officer safety.

The Court need not address the sweep of the areas that were not adjoining the hallway or the living room, as there was no evidence viewed in these areas that was not later seized pursuant to a valid search, as discussed below. Additionally, the evidence observed in the kitchen was what prompted further investigation, including the search of the residence.

**B.     Consent to Search**

The Defendant contends that, under the totality of the circumstance, any reasonable person in his position would "have felt that he had no choice but to consent" to a search of his residence. (Def. Mem. 10, DE 28.) He points to his ninety minutes of custody, the presence of numerous law enforcement officials, his knowledge that officers had already seen evidence of

13

controlled substances, and the lack of formal *Miranda* rights being issued.

Consent searches are only valid if the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Voluntariness of consent is a question of fact dependent on the totality of the circumstances, and the government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006). In determining whether an individual's consent was given voluntarily, this Court considers: (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he consented; (4) whether consent was immediate or prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in police custody when he consented. *Id.*

From the time Officer Rivera entered the home, the Defendant recognized him and initiated conversation. After learning the circumstances, Officer Rivera asked the Defendant if he would consent to a search of his home. The Defendant agreed, and Officer Rivera retrieved a form from his car. The Defendant read the consent to search property form, and Officer Rivera read the form to him as well. The top of the form advised the Defendant of his right to require that a search warrant be obtained, to refuse to consent to a warrantless search, to talk to a lawyer for advice before consenting, and that an attorney could be appointed for him if he was unable to employ one. The Defendant signed that he understood these rights. The form states that the Defendant authorized the named officers to seize and remove property, that no promises or threats caused his consent, no pressure or coercion was used, and his consent was freely and voluntarily given with the "specific knowledge that I have a constitutional right to refuse to consent to a warrantless search and to discuss my decision with a lawyer prior to consenting to a

14

warrantless search of my property." (Supp. Hr'g Ex. 11.)[8] Officer Rivera testified that his conversation with the Defendant was one of the most cordial he had ever had with a suspect and that the Defendant immediately consented. Although the Defendant had already been in police custody for nearly ninety minutes, most of that time was spent waiting inside the house for ATF to arrive. Another portion was spent retrieving and going over the consent form, which took place after the Defendant already verbally consented to a search. The Defendant's handcuffs were removed during his conversation with Officer Rivera, and he was sitting in a chair. No weapons were drawn during this time, and none had been since the Defendant was first arrested and a protective sweep conducted. There is no evidence that the Defendant was traumatized by this earlier display of weapons. In fact, the Defendant himself had a loaded gun and extra magazines. There is nothing particularly striking about the Defendant's age, his intelligence, or his education as factors affecting voluntariness, and certainly nothing that would indicate he was not able to freely consent to the search. The Defendant argues that the discovery of contraband in plain sight made it so that he had no choice but to consent to a search because he did not know that the sweep was illegal. Because the Court has already determined that the sweep did not violate the Defendant's rights, the argument that the sweep impermissibly tainted his consent is without force.

The totality of facts in this case support the conclusion that the Defendant's voluntary consent to the search was not coerced from him by the actions of the deputies or the ATF agents and, therefore, the search of his house was constitutionally permissible. Even if the Court

---

[8] The Defendant argues that he was not provided his full *Miranda* rights, but does not indicate how this vitiated his consent to the search, particularly in light of being advised that he had a right to refuse to consent and the right to an attorney. The Defendant does not point to any statement that he made to police during this time that he wants suppressed from a trial in this matter.

decided otherwise, the search would be upheld under the doctrine of inevitable discovery, which allows the use of evidence if the government can show that the information "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003). To demonstrate that a discovery was truly "inevitable," the prosecution must establish that it had probable cause and prove the existence of "a chain of events that would have led to a warrant . . . independent of the search." *Brown*, 328 F.3d at 357 (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)). The doctrine only applies where is it clear that "the deterrence rationale of the exclusionary rule has so little basis that the evidence should be received." *United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996)).

Here, the deputies went to the address where they had information to believe the Defendant was located to effectuate an arrest warrant. Incident to the arrest, they discovered a gun. They also discovered ammunition in plain view in a room that the Defendant requested that a deputy go into to retrieve pants for him to wear to jail. During a protective sweep of the kitchen, a room adjoining the hallway where the Defendant asked a deputy to pass through to retrieve his pants, deputies saw evidence of drug trafficking in plain view on the counter top. Given these findings, the deputies called ATF. When Officer Rivera and Agent Skender arrived, the deputies told them of the guns, ammunition, and evidence of drug trafficking in the kitchen. Officer Rivera talked to the Defendant and asked whether the house was his and whether he would give his consent for officers to search the house. Officer Rivera testified that if the Defendant had not consented to a search, he would have sought a search warrant, and that he had probable cause to obtain one.

The firearm and the evidence of controlled substances and drug dealing paraphernalia provided sufficient probable cause for a warrant. Officer Rivera's testimony that he would have actually sought a warrant was believable, both based on his demeanor as a witness, and upon the reasonable implication of the contraband already viewed in plain sight.

The exclusionary rule is a judicially created remedy that prohibits the government from introducing at a defendant's trial evidence of guilt that was obtained through violations of the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 908 (1984). The exclusionary rule "should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *Brown*, 328 F.3d at 357 (citing *United States v. Salgado*, 807 F.2d 603, 607 (7th Cir. 1986)). The Court has found that law enforcement officers were justified in searching the Defendant's house pursuant to his voluntary consent. But even if that were not the case, the agents here had enough information, without evidence obtained during the consented search, to obtain a warrant, and they would have done so. The evidence would have been lawfully obtained, and the exclusionary rule sanction would not apply.

**CONCLUSION**

For the forgoing reasons, the Defendant's Motion to Suppress [DE 18] is DENIED. A Final Pretrial Conference is set for Monday, February 9, 2009, at 10:30 AM before Judge Theresa L. Springmann. The Court will initiate the call. A jury trial is scheduled to begin on Tuesday, February 17, 2009, at 8:30 before Judge Theresa L. Springmann.

SO ORDERED on January 8, 2009.

                                    s/ Theresa L. Springmann
                                    THERESA L. SPRINGMANN
                                    UNITED STATES DISTRICT COURT